[Crim. No. 7029.   Second Dist., Div. Two.   Sept. 19, 1960.]

THE PEOPLE, Respondent, v. JACQUELINE LOUISE BACA et al., Appellants.

Walter L. Kroneberger, Jr., for Appellants.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Ernest E. Sanchez, Deputy Attorney General, for Respondent.

FOX, P.J.—Separate informations were filed against the defendants: One charged that Rudy Baca violated section 11500, Health and Safety Code, in that he unlawfully had marijuana in his possession on March 18, 1959; the other charged that Jacqueline Louise Baca violated the same section in that she unlawfully had heroin in her possession on that date. These cases were consolidated, and each defendant was found guilty as charged. A motion for a new trial was made and denied as to each defendant. Rudy was sentenced to one year in the county jail. Jacqueline was placed on probation for three years. Rudy has appealed from the judgment and order denying his motion for a new trial. Jacqueline has appealed from the order granting probation (Pen. Code, § 1237.1) and the order denying her motion for a new trial.

The sheriff's office of Los Angeles County had information from a person whose reliability had not been established that Rudy was engaged in the sale of narcotics from his residence during the evening hours. As a consequence, his residence was placed under surveillance. On the evening of March 16, 1959, the officers observed several different vehicles parked in front of the Baca residence at different times.

On the evening of the 17th, at approximately 7:30, three persons arrived at the Baca residence in an automobile. One left the car and went up to the house; someone opened the door and stood inside the screen; after three or four minutes, the person at the screen door disappeared and then came back and opened the screen door and remained there for a couple of minutes. He then went inside the house and reappeared at the front bedroom window, which faces onto the porch. He opened the screen of the bedroom window, and the police observed a hand and arm extend out of the window toward the person on the porch. This latter person then returned to the automobile and entered the rear seat. The car left immediately and was followed by the police. The car which was being pursued was overtaken while it was stopped by a red light traffic signal. Two deputy sheriffs "jumped" the stopped car. The person in the rear seat of the vehicle was observed to place his hand to his mouth. One of the deputies

entered the rear seat and a struggle ensued with the occupant, one Diaz. All three occupants of the car were placed under arrest. Diaz was found to have fresh hypodermic marks on his person, and admitted that he was using narcotics. He told the police that he had gone to the Baca residence to purchase narcotics but denied that he had actually made a purchase. He also denied having had any narcotics on his person and denied swallowing any. The other two occupants of the car stated that Diaz had asked them to take him to the Baca residence but had not told them why he wanted to go there.

The next evening the officers saw Rudy leave his home in his automobile. Two officers followed it. They lost sight of it but later observed it once again in the area. The officers thereupon rejoined the others, who had Rudy's residence under surveillance. Included in the group were officers from the Torrance police station. Officer Berman and two other officers approached the Baca residence. Berman knocked on the door. After a lapse of three or four minutes a female voice asked "Who's there?" Berman inquired, "Is Rudy home?" The voice replied, "No, just a minute." Approximately four minutes later Mrs. Baca came to the door and opened it. Berman again inquired, "Is Rudy home?" Mrs. Baca stated that he was not. Berman then said, "I came to see him about some business." Mrs. Baca replied: "Well, he will be back later." At that point Berman identified himself and his fellow officers as sheriff's narcotics officers. He opened the screen door, walked in, and advised Mrs. Baca that she was under arrest for violating the state narcotic laws. At that time other officers entered from the rear. About 20 minutes later Rudy drove by. He circled the block two or three times at a very slow speed. He then pulled into the driveway, honked his horn, backed out, and honked his horn again. At the suggestion of Berman, Mrs. Baca went to the door and gave Rudy the name of a person who she said wanted him on the telephone. Rudy immediately left at a high rate of speed. He was followed by two police officers who arrested him five blocks from his residence. He was taken back to his house.

A search was made of the residence. A green leafy substance, which proved to be marijuana, was found behind a headboard in the bedroom. The police told Rudy that both he and his wife were going to jail because they didn't know whose marijuana it was. Rudy then stated, "Well, it's my

weed. It's all mine.'' The officer also discovered a box containing empty Number 5 gelatin capsules in the house. Such capsules are used in the narcotic traffic in handling and disposing of heroin. The defendants were taken to the Torrance Police Station, where Mrs. Baca was searched by a policewoman. Five balloons containing 73 capsules of heroin were removed from her private parts. Mrs. Baca told the police that the capsules had been hidden in the cabinet of a hi-fi set. She said that they belonged to her husband and that when she heard the officers knocking on the door she had taken them from their hiding place and secreted them on her person.

Neither defendant took the witness stand. Diaz was, however, called by the defendants. He testified that he had been arrested by the police on the evening of March 17th and had been interrogated by them. He denied that he told them he had gone to the Baca residence to purchase narcotics. He stated that his purpose in going there was to seek information about a possible position. He denied putting his hand to his mouth when the officers approached the car in which he was riding. He claimed that he only made a defensive move toward his face.

In seeking a reversal defendants contend that there was no reasonable cause to arrest either of them, and that the search of their residence was not incident to a lawful arrest. ■ ''Reasonable cause has been generally defined to be such a state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime.'' (*People* v. *Ingle,* 53 Cal.2d 407, 412 [2 Cal.Rptr. 14, 348 P.2d 577].) ■ However, ''there is no exact formula for the determination of reasonableness. Each case must be decided on its own facts and circumstances.'' (*People* v. *Ingle, supra.*)

■ In determining whether there is reasonable cause we must look at the facts and circumstances known to the officers at the time they make an arrest or search. (*People* v. *Murphy,* 173 Cal.App.2d 367, 377 [243 P.2d 273]; *People* v. *Cantley,* 163 Cal.App.2d 762, 765 [329 P.2d 993].) The difficulty comes in evaluating the significance of these facts and circumstances. The trial court found there was reasonable cause for the arrest of the defendants and the search of their house. ''Unless it can be said that prudent men in the position of these officers knowing what they knew and seeing

what they did would not have had reasonable cause to believe and to conscientiously entertain a strong suspicion that [defendants were] violating or had violated the law, the arrest should be held lawful." (*People* v. *Ingle, supra.*)

In evaluating the situation with which the officers were faced it seems appropriate to quote the recent observation of this court in *People* v. *Hollins,* 173 Cal.App.2d 88, 93-94 [343 P.2d 174] : "Our strong devotion to the cherished principle that the citizen shall not be subjected to unreasonable treatment at the hands of the agents of society must be tempered with some reasonable appreciation of the facts of life and of the great dangers and difficulties which beset the officer of the law in his effort to protect the community from the blighting scourge of the narcotic traffic." ▮ In this connection we note the comment of the Supreme Court in the Ingle case, *supra,* page 414 : "Police officers are guardians of the peace and security of the community; their problems are manifest and complex and they should not be held to accountability greater than that required of any other reasonable or prudent man under like circumstances."

▮ Also, it should be pointed out, "Recent authorities hold that in order for a search and seizure to be valid it is not necessary that the arrest precede the search and seizure. If the search and seizure are part of the same transaction, the search and seizure may occur prior to the arrest." (*People* v. *Vice,* 147 Cal.App.2d 269, 273 [305 P.2d 270].) ▮ "Thus," said the court in *People* v. *Simon,* 45 Cal.2d 645, at page 648 [290 P.2d 531], "if the officer is entitled to make an arrest on the basis of information available to him before he searches, and as an incident to that arrest is entitled to make a reasonable search of the person arrested and the place where he is arrested, there is nothing unreasonable in his conduct if he makes the search before instead of after the arrest."

▮ Applying these principles to the facts and circumstances herein recited it seems apparent that the officers had reasonable cause to arrest the defendants. They had information that Baca was selling narcotics during the evening hours at his residence; they had observed various vehicles parked in front of the Baca residence during their surveillance of it; they observed Diaz make a furtive motion toward his face when the car in which he was riding was overtaken by the sheriff's car; he then told the officers that he went to the Baca residence to purchase narcotics; the officers saw needle marks on his arms; he admitted he had been using

narcotics. Taking into account what the officers had been told about Rudy's operations, what they had observed while the Baca residence was under surveillance, and what they had learned from their conversation with and examination of Diaz, the officers had reasonable cause to believe and conscientiously entertain an honest and strong suspicion that narcotics were being sold by Rudy at his home. They therefore had reasonable cause to arrest Rudy and search his house, since that appeared to be his base of operations. In view of Rudy's apparent narcotic activities being carried on at his home during the evening hours, it is likely that from time to time he maintained a supply of contraband in the house and that his wife was involved in the possession thereof. In such a setting she would be strongly suspect. Her delay in opening the door would add to the suspicion of her involvement in view of the information the officers already had, for it would be natural for her to take time to hide or otherwise secrete any contraband that might be visible or easily found. (And that is exactly what she did.) Thus the officers were provided with sufficient facts and circumstances reasonably to justify the arrest of Mrs. Baca.

Rudy complains that the officers entered and searched his home without a search warrant, prior to his own arrest, and at a time when they knew he was not there. As previously pointed out, it is not significant whether the search precedes or follows the arrest provided they are part of the same transaction. (*People* v. *Vice, supra*; *People* v. *Simon, supra*.) In such case the important consideration is whether the officer had reasonable cause before the search to make an arrest. (*People* v. *Simon, supra*; *People* v. *Luna*, 155 Cal.App.2d 493, 495 [318 P.2d 116].) We have already held that the officers had reasonable cause to arrest both defendants. And it is apparent that the arrests and the search of the premises were part of the same transaction. The arrest of Rudy was simply a matter of contacting him and this took place about 20 minutes after the entry of the house by the officers. In the Vice case, *supra,* the court pointed out (p. 274) that "although the seizure of the narcotics preceded the arrest of the appellant by a half hour or so, nevertheless the arrest and the seizure were part of one single transaction."

The fact that Rudy was not in the house does not militate against the legality of the entry under the circumstances. Much the same situation developed in *People* v. *Vice, supra.* There a supervising narcotic inspector had reliable

information that Vice had narcotics in his hotel room. The inspector sent two other officers to arrest Vice on a charge of possession. When they entered the room Vice was not there. They so informed the inspector, who proceeded to another part of the city where he found Vice and placed him under arrest. In the meantime the other officers searched the defendant's room and found narcotics under his sink. The court held that although the defendant was not present in the room at the time the officers arrived, nevertheless the search and seizure were legal since the officers had reasonable cause to arrest the defendant prior to entering his room, and since this was all part of a single transaction. In *People* v. *Luna, supra,* the officers had reliable information that defendant had narcotics in his apartment. They knocked on the door but there was no response. They forced their way into the apartment, where they found heroin. The officers waited until defendant returned and then took him into custody. The court held that there was no illegal search or seizure.

Rudy argues that since he was not arrested at his home but some five blocks away the officers had no right to search his premises. This argument is adequately answered in *People* v. *Cicchello,* 157 Cal.App.2d 158 [320 P.2d 528]. In that case Presiding Justice Shinn stated (pp. 162-163) that "with respect to the search of the apartment, defendants argue that the premises were located more than half a block from the place where they were apprehended, and that the apartment was not in the immediate vicinity of the arrest, hence a search of the apartment cannot be justified as an incident to the arrest. The argument is without merit. There would be no doubt of the officers' right to search the apartment had defendants been arrested while they were inside it or as they were leaving. We do not think the fact that defendants were apprehended in their car at some distance away affords any ground for a tenable distinction. The officers' information and observations all related to defendants' activities in a specific place. *The apartment was their headquarters and their scene of operations. . . .* The arrest and search were contemporaneous and part of a single, continuous transaction. If it was a reasonable inference that defendants were recording bets in the apartment, it was also a reasonable inference that defendants' bookmaking paraphernalia was to be found there. The arrest occurred in the immediate vicinity of one of two places which the officers had reason to believe were being used by defendants for bookmaking purposes,

namely, their automobile. The officers had definite information about the other. They did not stumble upon the apartment or go there in the mere expectation that something might turn up. We think that the officers were justified in making a search of the apartment and that the evidence obtained thereby was properly received.'' (Emphasis added.) So here, the Baca home was the scene of Rudy's operations.

Defendants' reliance on *Hernandez* v. *Superior Court*, 143 Cal.App.2d 20 [299 P.2d 678], and *Agnello* v. *United States*, 269 U.S. 20 [46 S.Ct. 4, 70 L.Ed. 145, 51 A.L.R. 409], is misplaced. Neither is applicable to the situation at bar. In the Hernandez case, ''Petitioner and one Taverez resided in an apartment at the rear of 1814 Workman Avenue in the city of Los Angeles. Taverez had been indicted by the grand jury of Los Angeles County on a charge of the sale of narcotics. Police of the city of Los Angeles learned that an automobile used by him was parked on Workman Avenue (adjacent to the apartment house in which petitioner and Taverez resided). The police staked out in the vicinity of the parked automobile, and when Taverez entered it they placed him under arrest and there took him into custody. After he was under arrest the officers were advised by a bystander that Taverez lived in an apartment at the rear of 1814 Workman Avenue, the door to which was about 95 feet from the place on the public street where Taverez was held under arrest, and that it was the apartment with a light on. The officers then went to the apartment indicated by their informant and entered without invitation. They there found petitioner. They did not then have any knowledge of any unlawful act having been committed by petitioner, nor did they have any basis for believing that petitioner had committed a felony. They did not have a warrant for her arrest or a search warrant. They proceeded to search the apartment and found therein a quantity of narcotics. Petitioner admitted that one of the narcotics (dolophine) was hers and that she was using it. Petitioner was then placed under arrest.'' It was argued that the search of the apartment occupied by petitioner and Taverez was a proper incident to the lawful arrest of Taverez. The court properly held there was no legal right to search the premises in question. The arrest of Taverez was obviously the result of and pursuant to his indictment by the grand jury. It was not because of any information the police had that he was then engaged in selling narcotics at the apartment or that he had narcotics in the apartment. The apart-

ment was not the "scene of operations" as in the Cicchello case, supra, and in the instant case. The arrest was unrelated to any asserted illegal activities then being carried on in the apartment. The search could not, therefore, have been incident to the arrest of Taverez. In the Agnello case, *supra*, Agnello was arrested in connection with the delivery of narcotics to undercover agents at the home of one Alba, whose premises were searched. A search was also made of Agnello's home. It was held that this latter search was improper and evidence there discovered was inadmissible. It, of course, was not the "scene of operations" (that being the Alba home which was searched) as was the Baca home in the case at bar. *People* v. *Gorg,* 45 Cal.2d 776 [291 P.2d 469], which cites the Agnello case with approval, is not opposed to the views we have expressed herein.

Affirmed as to each defendant.

Ashburn, J., concurred.

A petition for a rehearing was denied October 14, 1960, and appellants' petition for a hearing by the Supreme Court was denied November 16, 1960.