[Crim. No. 8189. Second Dist., Div. Four. Jan. 29, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. JAMES LANE KENDALL, Defendant and Appellant.

Donald R. Mizener for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Gilbert F. Nelson, Deputy Attorney General, for Plaintiff and Respondent.

BURKE, P. J.—In an information filed by the District Attorney of Los Angeles County defendant was charged with four counts of abortion in violation of section 274 of the Penal Code. Defendant was also charged with a prior felony conviction of the crime of abortion. Defendant made a motion pursuant to section 995 of the Penal Code which was denied. Defendant entered a plea of not guilty to the offenses charged and denied the prior conviction. Trial was by jury, and before the taking of testimony defendant admitted the prior out of the presence of the jury. Defendant was advised of his right to be represented by counsel but indicated that it was his desire to proceed without counsel. Defendant was found guilty as charged. Probation was denied and defendant was sentenced to state prison for the term prescribed by law on each count, with the sentences to run concurrently with each other. This is an appeal from the judgment of conviction in which defendant is represented by counsel.

Donna L. Walls, an unmarried girl, testified that her regular menstrual periods were interrupted in February 1961 and she observed the symptoms of pregnancy. In June she talked to her boy friend, Mike McKane. They agreed upon an abortion. Through her boy friend she was introduced to Art McClinton whom she accompanied to the Arroyo Seco Park where they waited until defendant arrived. Defendant left his car and sat with Miss Walls and McClinton in the front seat of McClinton's car. Miss Walls told defendant she thought she was pregnant and defendant replied that he could help her; he would give her a solution to cause a miscarriage and it was agreed that Miss Walls would call him in about a week as soon as school closed. Defendant gave her his telephone number.

The following week Miss Walls telephoned defendant and arranged to meet him at a certain gas station. Defendant left

his car and entered her automobile. Subsequently she followed defendant to the trucking business office on Fountain Avenue called "Dispatchers, Incorporated" where defendant was employed. Defendant got a brown bag. He then led the way down a side street or alley to a small house located behind a larger house about 250 feet away from the office. Defendant took Miss Walls into a bedroom in the small house and there boiled some instruments on a burner stove. He then directed her to disrobe and lie on the bed and inserted a long silver tube in her vagina through which he placed some solution into the vaginal area. She felt cramps, which defendant said was a normal reaction. He informed her that a miscarriage should follow in about 12 to 18 hours and that she should report to him by telephone. Defendant followed her out to her car where she secured $140 which she paid to defendant, $120 of which amount was contributed by her boy friend, Mike.

About four days later she telephoned defendant and told him that nothing had happened. He told her that he would use a different method. She then met defendant on or about June 22 at which time he again took her to the same bedroom in the small house near his office. On this occasion he inserted a gauze pack into the vaginal opening. Subsequently, on July 3 when no result had been achieved he again inserted a pack and again a final pack on July 31. On this latter occasion she subsequently became ill, an ambulance was called by her parents and she was taken to the county hospital where she miscarried.

Miss Walls identified a photograph of the building and of the bedroom where defendant had taken her, the aluminum pan and other articles he used and the pills which he had instructed her to take. She further testified that he had instructed her that if it became necessary for her to see another doctor she was first to remove the vaginal pack so that there would be no connection made between Miss Walls and defendant.

Arthur McClinton testified for the People. He stated he was first contacted by Miss Walls' boy friend, Mike McKane, who told him his girl friend wished to terminate her pregnancy. McClinton told McKane he knew someone who might help and mentioned the name of defendant whom he called "Doctor Kendall." McClinton went to see defendant and made arrangements for defendant to meet Miss Walls. Mc-

Clinton stated he had been asked by Mike to find out how much defendant would charge and that defendant had told him ''it would be around $200 or so He said he didn't know. Two or three, I don't remember now what it was.'' He testified concerning the meeting in Arroyo Seco Park. He said that Miss Walls had a calendar in her hand and was discussing with defendant how long she had been pregnant. He first thought the park meeting was in July. The prosecutor advised the court that this testimony caught him by surprise; and, out of the presence of the jury, that it varied with a previous statement secured from the witness and asked permission of the court to cross-examine him as a surprise witness. Under cross-examination McClinton admitted that it was possible that the park meeting took place in the early part of June. At the close of his testimony the witness volunteered the statement that as defendant left his car he said ''he was glad to have met Miss Walls but sorry he couldn't help her.'' He remembered this portion of the conversation but that was about all.

Michael McKane testified that he had been working with Mr. McClinton in a service station; that he told him he needed help for his girl friend in regard to a pregnancy; and that he gave Miss Walls $120 for the abortion.

The arresting officer testified that in the company of fellow officers he went to the Dispatchers, Incorporated, office to arrest defendant. The officers had the information concerning the probable abortion that was performed in the small frame house up the alley. Subsequent to the arrest a Mr. Bojorkland approached the office and from an inquiry as to where he resided it was ascertained that he lived in the small house where the abortion allegedly had taken place. The arresting officer testified he inquired of Mr. Bojorkland whether they could go up to the house and look in it and that he said that they could and took them to the house. When they arrived at the house, according to the officer, defendant stated to Bojorkland, ''You know, you don't have to let them in here if you don't want to, and I wish that you would not.'' Bojorkland then said, ''Well, I don't think I'll let you go in.'' The officer stated that it occurred to him that Bojorkland had guilty knowledge concerning the abortion and that he immediately placed him under arrest and then proceeded to enter the house. In the house they located the aluminum pan under the bathtub and the speculum and catheter in paper bags under the daybed. They also found penicillin pills in

the middle drawer of defendant's desk in the office where he was arrested.

On appeal defendant first contends that the trial court committed error in admitting evidence obtained by the police as a result of an illegal search and seizure. The issue is the reasonableness of the search under the circumstances of the particular case. (*Carroll* v. *United States,* 267 U.S. 132, 149 [45 S.Ct. 280, 69 L.Ed. 543, 39 A.L.R. 790]; *People* v. *Brown,* 45 Cal.2d 640, 643 [290 P.2d 528].) Defendant objected to introduction of an item of evidence which was taken from the person of Mr. McClinton when he was arrested. ▮ A search incident to lawful arrest extends to the person. (*People* v. *Anders,* 167 Cal.App.2d 65, 68 [333 P.2d 854].) The other exhibits sought to be suppressed were the ones found in the small house.

▮ The hearing on the defendant's motion to suppress the evidence was conducted by the trial court out of the presence of the jury. It was shown that the arresting officer had information that a criminal abortion had been performed by defendant on Miss Walls and that the small house reached by the alley to the rear of defendant's office was the place where the abortion was actually committed. The encountering of Mr. Bojorkland at defendant's office and his consent to a search were related to the court as well as the subsequent withdrawal of consent at the request of defendant. Under the circumstances this about-face on Bojorkland's part suggested complicity or guilty knowledge of the abortion under investigation whereupon the officer placed Bojorkland under arrest. Under these circumstances the officers were entirely justified in searching the latter's residence. The officers had ample ground to arrest Bojorkland for possible complicity in the commission of the abortion. The officers also acted reasonably in searching the house located as it was only 200 to 250 feet away from defendant's office as an incident to the latter's lawful arrest. The house was the "scene of defendant's operations." (*People* v. *Aleria,* 193 Cal.App.2d 352, 359 [14 Cal.Rptr. 162]; *People* v. *Baca,* 184 Cal.App.2d 693, 700-702 [7 Cal.Rptr. 864]; *People* v. *Cicchello,* 157 Cal.App.2d 158, 162-163 [320 P.2d 528].)

Defendant next contends that there was no corroboration of the testimony of the victim by the witness McClinton, whose testimony, according to one of the instructions given to the jury, constituted the required corroboration. ▮ This

478

particular instruction was one of a series of instructions given by the court on the whole subject of abortion, including the necessity of corroboration of the abortee, that corroboration may be made by an accomplice, that an accomplice may be corroborated by the abortee and as to the requirements of corroborating evidence. The particular instruction singled out by defendant reads:

"592-A

"Corroboration May Be by Accomplice

"That corroboration may be supplied by the testimony of Arthur J. McClinton, either alone or in connection with other evidence in the case, provided that such evidence offered for the purpose of corroboration meets certain requirements shortly to be stated."

It will be noted that this instruction does not limit the corroboration to the testimony of McClinton. There was no error in the giving of this instruction.[1]

Defendant asserts that McClinton's testimony actually negatived the commission of any offense by defendant in view of his statement that at the conclusion of the conference at which McClinton was present he stated that he "was sorry he couldn't help her." There is strong corroborative evidence in the testimoy of McClinton, however. He testified he was the one who had actually arranged the appointment with defendant for the purpose of discussing the terminating of Miss Walls' pregnancy. He also testified as to his discussion with the defendant of the amount defendant would charge for terminating the pregnancy.

In cases such as *People* v. *Crain*, 102 Cal.App.2d 566, 579 [228 P.2d 307], it is made clear that such corroborative evidence must connect the defendant with the commission of the crime charged against him. " 'And, though we may concede that such corroborative evidence arouses a suspicion, even a grave suspicion, nevertheless it is not sufficient to establish the corroboration required by law. Furthermore, when viewed without recourse to the testimony of the prosecutrix, the "corroborative circumstances" standing alone, while they may be said to generate a suspicion of guilt, are as compatible with innocence as they are with guilt of the crime denounced by section 274 of the Penal Code.' " The *Crain* case, however, is to be distinguished from the case before us. In

---

[1] Other instructions given included California Jury Instructions, Criminal, CALJIC No. 593-C (Rev.), No. 593; also Nos. 592 and 592-B.

*Crain* the defendant was a licensed and practicing physician and his possession and use of medical instruments utilized in the examination and treatment of women was entirely proper and by themselves created no suspicion. Here, the defendant while possessed of a medical degree or degrees (according to the testimony of his wife) was not a duly licensed physician.

The nature of corroboration required to sustain the charge of abortion is clearly stated in *People* v. *Gallardo,* 41 Cal.2d 57, 62, 63 [257 P.2d 29] : "Corroboration is sufficient if it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the woman [the abortee] is telling the truth. [Citing cases.] It has been held that the corroborative evidence need not by itself establish that the crime was committed or show all the elements thereof, but it must relate to some act or fact which is an element of the offense. [Citing cases.] It must create more than a suspicion, but it may be sufficient even though slight and entitled to but little consideration when standing by itself. [Citing cases.]

"A woman who has submitted to an abortion is not an accomplice of the persons charged with procuring or conspiring to procure the miscarriage. [Citing cases.]"

Corroborative evidence in the case before us is to be found not only in the testimony of McClinton but also in that of McKane since McClinton gave McKane the name of defendant, calling him "Doctor Kendall." McKane gave Miss Walls the $120 which was part of the money which the latter stated she paid defendant. As has been pointed out, both McClinton and McKane corroborated Miss Walls and their status as accomplices does not disqualify them as corroborating witnesses. (*People* v. *Kutz,* 187 Cal.App.2d 431, 436 [9 Cal.Rptr. 626].) That an abortion had in fact been committed was proven through the testimony of the medical expert who took care of her at the hospital.

Lastly, defendant contends that the argument of the prosecutor was designed to influence the passion of the jury against him. We granted permission to defendant to augment the record and have reviewed both the opening and closing arguments of the prosecutor. Only one statement is singled out by defendant as being clearly prejudicial and intended unduly to influence the jury against defendant, as follows:

"And one more thing : if you find that you are starting to feel sorry for this man and that is interfering with your reason, I just want to say that that baby—this would have

been its first Christmas. So don't waste too much pity on this man. I think the evidence has shown that he is guilty of this crime, and I leave it to your consideration.''

We do not deem this statement to go beyond the limits of propriety. Defendant concedes in his closing brief that defendant raised no objection at the time this statement was made nor did he request the court to instruct the jury to disregard it.

Defendant was well and fairly tried. The evidence of his guilt was substantial.

Judgment is affirmed.

Jefferson, J., and Bishop, J. pro tem.,* concurred.

*Retired judge of the superior court sitting pro tempore under assignment by the Chairman of the Judicial Council.