[Crim. No. 8407.   Second Dist., Div. Two.   Mar. 14, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. ROGER TAPIA CISNERAS, Defendant and Appellant.

Robert L. Dicker, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and S. Clark Moore, Deputy Attorney General, for Plaintiff and Respondent.

FOX, P. J.—Defendant Roger Cisneras was convicted of possession of heroin in violation of section 11500, Health and Safety Code. He appeals from the order denying his motion for a new trial and from the judgment of conviction.

Two issues are presented by defendant on this appeal: (1) Was the evidence upon which defendant's conviction was predicated obtained illegally in violation of constitutional rights?; and (2) Does failure formally to admit the heroin into evidence constitute reversible error?[1]

In early December 1961 Officer Fesler of the Narcotic Division of the Los Angeles Police Department arrested Joel Hernandez for possession of heroin. Hernandez told the officer that he was buying his heroin from a man named "Roger" who "hung out" around Temple and Figueroa. Hernandez described Roger and his car. Later that day Officer Fesler went to a "hangout" for narcotic peddlers and users where he saw Roger Cisneras playing pool. The officer recognized him from the picture he had seen in the narcotic division "mug book."

During the approximate next two months Fesler investigated certain of defendant's activities, interrogated him several times about narcotics, and with defendant's consent searched his person and living quarters but found no contraband. From the latter part of December to the end of January 1962, Fesler had defendant under periodic surveillance. During this period the officer learned considerable about de-

---

[1]The two issues can logically be separated; i.e. issue (1) can be discussed as though the capsules had been formally introduced, and issue (2) can be discussed as though there were no question as to the admissibility of the capsules and testimony regarding their discovery.

fendant's activities—sufficient for him to procure both a search warrant and a warrant for defendant's arrest.

On February 1, 1962, Officer Fesler learned that defendant had rented an apartment at 1151 North Coronado. Fesler, who had the warrants, and Sergeant Dorrell stationed themselves outside the door of defendant's apartment. In view of defendant's principal argument it is important to have an accurate account of the fracas between defendant and the officers when defendant emerged from his apartment. With slight editorial revision, Officer Fesler's account of this incident is as follows: After hearing someone come up the back steps and enter the apartment, we waited until approximately 6:05 p.m., when Roger came out of the door of the apartment. I was standing approximately 2 to 3 feet from him when he came out and I could see that his cheeks were extended indicating some substance in his mouth. I stated something to the effect that you certainly have a mouthful this time. At that time Roger turned away from me and took a step toward the front of the building where he came face to face with Sergeant Dorrell. Sergeant Dorrell reached out his hand toward Roger's mouth and stated, "Give it to me, Roger." At that time Roger struck out at Sergeant Dorrell, striking him in the face. Then Sergeant Dorrell and Roger continued to exchange blows. At that time I grabbed Roger Cisneras from the back and pulled him away from Sergeant Dorrell but they continued to exchange blows from the front. At that time Roger placed his feet against the wall on the opposite side of the hall and crushed me back against the wall on the side that I was standing. I continued to hold him and told him to spit out the narcotics but then I lost my balance and my feet slid to the floor, taking Roger with me to the floor. He continued to brace his feet on the opposite wall and continued to smash me against the other wall. Sergeant Dorrell and he were still exchanging blows as he went down. After approximately 40 to 60 seconds Roger turned his head to one side and spat out several objects that appeared to me to be balloons on the floor. I worked myself free and recovered these objects. These objects appeared to contain a bindle of paper the inside of which, in my experience as a narcotic officer, contained heroin.

Scientific tests showed that the substance was in fact heroin. Officer Fesler asked defendant how much heroin he had in his mouth. He stated there was about three and a half there. The officer also inquired why he had it in his

mouth. He replied that he was going to move the narcotics. Search of defendant's apartment failed to reveal any additional contraband.

After Sergeant Dorrell was hit on the side of the face there was a brief flurry of blows between the sergeant and defendant. During this period Dorrell's shirt was torn. At that point Fesler grabbed defendant from behind. Although the officer attempted to get his arm across defendant's throat and apply the bar strangle, he was not too successful for, as he recalled, defendant had his throat turned to the side and spat the balloons out over his right elbow. The officer believed he caught defendant across the mouth for he had two teeth marks on his right wrist. He stated he did not place his fingers around defendant's neck or throat. The officer testified that his purpose in grabbing defendant was to subdue him and place him under arrest and place handcuffs on him. After defendant was subdued and arrested both officers reported to the Central Receiving Hospital. Fesler was treated for what appeared to be teeth marks in the area of his right wrist. Dorrell was treated for scratches and abrasions on his face and a sprained finger.

Defendant testified that when he came out of his apartment and was in the act of closing the door, someone jumped on his back, his right arm was put behind his back and pushed up. He felt a hand around his throat choking him. Defendant was here apparently referring to Officer Fesler. The other officer came in, hitting him in the stomach. He thought the struggle lasted from five to ten minutes. Defendant had never seen the balloons (People's 1 for identification) before the officers showed them to him after his arrest and none of them were in his mouth.

The basic question is: did the arresting officers violate defendant's constitutional rights by using excessive force to obtain the contraband defendant had in his mouth?

Defendant seeks to bring his case within the ambit of *Rochin* v. *California,* 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396]; *People* v. *Martinez,* 130 Cal.App.2d 54 [278 P.2d 26]; and *People* v. *Brinson,* 191 Cal.App.2d 253 [12 Cal.Rptr. 625]. None of these cases are here controlling. In *Rochin* the narcotic was recovered by pumping defendant's stomach after choking had failed to prevent him from swallowing it. In *Martinez* and *Brinson,* the contraband was recovered after the respective defendants had been

choked—one "a minute or two, 'maybe less' "; the other "at least a minute and half." In these cases the officers obviously used excessive force and violated the constitutional rights of the defendants.

■■■ The situation here is very different. When defendant emerged from his apartment, he found Officer Fesler whom he knew and who had talked to him relative to narcotics several times and had searched him on a couple of occasions, and another officer alongside his door. Fesler observed defendant's cheeks were extended, and remarked, "You certainly have a mouthful this time." Defendant turned away and started in another direction. He immediately came face to face with Sergeant Dorrell, who reached out his hand and said, "Give it to me, Roger." This request was answered by a blow to the sergeant's face. Upon any approach to this factual picture the officers were justified in subduing and arresting defendant. Their investigation and surveillance of defendant had produced sufficient information relative to his narcotic activities to enable them to get a search warrant and a warrant for his arrest. Although defendant knew Fesler he apparently made no response to the officer's comment about his having a "mouthful this time," but simply turned and started toward the front of the building. When Sergeant Dorrell held out his hand and said, "Give it to me, Roger," the officer was attacked. There can be no doubt that the officers had reasonable cause to arrest the defendant. (*People* v. *Ingle*, 53 Cal.2d 407, 412 [2 Cal.Rptr. 14, 348 P. 2d 577]; *People* v. *Baca*, 184 Cal.App.2d 693, 697 [7 Cal. Rptr. 864].) And when he attacked Sergeant Dorrell, the officers "[a]s reasonable men, in the circumstances of the situation, . . . were justified in using as much force as appeared reasonably necessary to enable them in safety to themselves to compel submission to the law's processes." (*People* v. *Brite*, 9 Cal.2d 666, 681 [72 P.2d 122].) In *People* v. *Almarez*, 190 Cal.App.2d 380 [12 Cal.Rptr. 111], the officer grabbed defendant by the shoulder and turned him around, whereupon defendant struck the officer twice, the blows landing on his neck and chest. Another officer joined the fray. A struggle ensued. All three men fell to the ground. Two gelatin capsules emerged from defendant's mouth. Defendant grabbed one of them and held it in his clinched fist. Defendant would not open his fist when told to do so. The officer then pounded defendant's fist three or four times until he opened it. In affirming the judgment of conviction, this

court pointed out that defendant took the first action and that "the officers used only such force as was necessary to accomplish the arrest and to defend themselves" and that "was proper." See also *People* v. *Woods,* 139 Cal.App.2d 515 [293 P.2d 901] ; *People* v. *Dawson,* 127 Cal.App.2d 375 [273 P.2d 938] ; *People* v. *Sanchez,* 189 Cal.App.2d 720 [11 Cal.Rptr. 407] ; *People* v. *Poole,* 174 Cal.App.2d 57 [344 P.2d 30]. ▮ Here defendant initiated the violence. The conduct of the police was reasonably necessary "to compel submission to the law's processes." (*People* v. *Brite, supra.*) It cannot be said in the circumstances that the conduct of the police was either unreasonable or shocking. If, as an incident to the struggle to subdue defendant, he spat the contraband out of his mouth, this would not make its recovery illegal so long as the officers acted reasonably in their efforts to compel his submission. Otherwise, we would encourage the law violator to resist the officers and thereby demoralize law enforcement.

Defendant earnestly argues that the contraband in this case was obtained by choking the defendant. The testimony of the officer does not, as a matter of law, require such a finding. (Defendant recognizes this for he says in his opening brief: "In the instant case, the people's evidence strongly suggests a choking. . . .") There is actually ample basis for a contrary inference. Merely putting "an arm hold around the neck" does not amount to choking (see *People* v. *Dawson, supra,* p. 376). The trial judge recognized this as is apparent from his comment: "Of course, the question was, was there a choking or did he merely have an arm lock around his neck." It was in this context that the court made the observation, to which defendant takes exception, that "the amount of pressure you put on it [the arm lock] makes a lot of difference." Obviously, if no pressure was administered there was no choking. Of course the court was not required to give credence to defendant's story as to what transpired because of his interest in the outcome of the case. ▮ Defendant also states, "There was, of course, a certain conflict in the record as to whether Fesler had his hand or his arm around the defendant's neck or throat. Most of this conflict, however, was in the officer's own testimony." But, as this court pointed out in *People* v. *Brister,* 192 Cal.App.2d 234 [13 Cal. Rptr. 375], at p. 237: "[S]uch conflicts, even in the testimony of a particular witness, are for the resolution of the trier of fact."

In support of defendant's second point—that the heroin was never admitted in evidence—he points to the fact that

tion predicated upon the use of a material object in the com- while the clerk's transcript shows People's exhibit 1 (envelope and contents) was received in evidence, the reporter's transcript only indicates that it was marked for identification but not formally received in evidence. He concludes, therefore, that "not being in evidence it can have no evidentiary significance."

The record is clear from the testimony of Officer Fesler that the capsules in court and marked People's 1 for identification were recovered by him and his brother officer from the defendant. There is also the evidence that these capsules contained heroin. It is apparent from the record that the proceedings in the trial court proceeded on the assumption that the contraband had been received in evidence.

This identical question was before this court in *People* v. *Munoz,* 198 Cal.App.2d 649 [18 Cal.Rptr. 82]. Relying on *People* v. *Shafer,* 101 Cal.App.2d 54 [224 P.2d 778] and *People* v. *Anderson,* 87 Cal.App.2d 857 [197 P.2d 839], we came to the conclusion that there was no merit in this point.

We pointed out that in the *Shafer* case, which was also a charge of possessing heroin, the court held that the testimony of the officers that they found the capsules on the seat of defendant's car practically at the moment he left it and that they were found to contain heroin was sufficient proof that defendant had violated the statute. The court stated (p. 60): "In view of such testimony the presence of the capsules in court was not essential to a fair trial. [Citations.]" In the *Anderson* case, the argument was made that there was no evidence to support the trial court's finding that defendant was armed with a deadly weapon because the gun used in the crime was not introduced in evidence. The court held, however, that "[i]n order to sustain a conviction mission of a crime it is not necessary that such object itself be introduced in evidence." (P. 861.) We then stated in *Munoz* (p. 653): "Applying the principles of these cases, it is apparent that a sufficient showing was made of defendant's possession of the heroin, even though it was not formally introduced in evidence." We adhere to our ruling in the *Munoz* case.

The appeal from the order denying defendant's motion for a new trial is dismissed. (Pen. Code, § 1237.) The judgment is affirmed.

Ashburn, J., and Herndon, J., concurred.

A petition for a rehearing was denied April 5, 1963.