301 P.2d 974]

[Crim. No. 3225.   First Dist., Div. One.   Oct. 8, 1956.]

## THE PEOPLE, Respondent, v. LONZO WILSON, Appellant.

2

Borah R. Hansen for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, Raymond M. Momboisse and Arlo E. Smith, Deputy Attorneys General, Thomas C. Lynch, District Attorney (San Francisco), and Philip J. Hanley, Deputy District Attorney, for Respondent.

PETERS, P. J.—Defendant was charged with three violations of section 337a of the Penal Code, in that (1) he kept or occupied a place for the purpose of recording bets; (2) that he recorded bets; and (3) that he made a bet upon the result of a race. He waived a jury trial. He was convicted on counts 1 and 2, and acquitted on count 3. He appeals from the judgment of conviction.

The principal point involved on this appeal is whether the basic evidence admitted over objection was obtained by means of an illegal search of defendant and of his automobile.

The facts are not substantially in dispute. In June of 1955 a police officer, in civilian clothes, was assigned the duty of keeping a designated pool hall and adjoining restaurant under surveillance. He performed this duty from June 9th to June 30th, 1955. Each working day during this period he observed the defendant, whom he had known before he became a policeman, from about 10 a.m. to 4:30 p.m., "loitering around the pool hall and the restaurant. Occasionally he would come in; might shoot a game of pool, but, as a general rule, he would walk into the pool hall, perhaps talk with some of the men that were there, then return to the restaurant, and sit at the counter." While in the restaurant "Practically each day that I would see him there, he would have the newspaper turned to the racing sheet. Men would come in and out of the restau-

rant, sit at the counter with him, and converse''; about 10 or 15 men would come into the restaurant each day and talk with defendant; ''Other than have a conversation together, there was nothing that I saw,'' except that normally the men and defendant would look at the racing section of the paper, but he observed no one pointing toward any names in the paper, nor did he overhear any conversation, nor did he observe defendant make any notations, nor did he see any money pass between them, nor did he see defendant make or receive any telephone calls. Defendant did not appear to be working in either the restaurant or the pool hall.

Once during the period of observation the officer asked defendant if he was still working at the shipyard. Defendant said that he was not, ''that he didn't have any regular employment; that he did odd jobs, such as painting, to get the money and support himself.''

On June 30th the officer entered the restaurant and told defendant that he wanted to talk to him on police business. The defendant accompanied the officer, and outside the restaurant, by prearrangement, they met the police sergeant who had received the officer's daily reports. The sergeant asked defendant if he was working; defendant said that he had been out of work for about two months, and that he was supporting himself by ''doing odd jobs, painting, and anything that he could get hold of.'' The sergeant thereupon placed defendant under arrest for vagrancy, and, without the permission of defendant, immediately searched defendant's person. In defendant's watch pocket the sergeant found a piece of tissue paper on which was recorded a bet placed on a horse in the 8th race at Hollywood Park that day. Defendant stated that he had placed that bet for himself with a newspaper vendor. In defendant's rear pocket was a racing form dated June 30th. In defendant's wallet was found $103 in currency, which defendant told the officers was to pay an overdue bill for the repair of his automobile. The sergeant then asked defendant where his automobile was parked, and defendant mentioned a place nearby. Then the sergeant ''told him we would like to look at the car to see what was in it,'' and the defendant ''furnished us the keys, and give us—gave us permission to search his car.'' The trial judge, significantly enough, when the sergeant so testified, stated ''Uncoerced, I'm sure.'' The officers did not tell the defendant that he did not have to permit the search.

Upon searching the car the officers noted a large pocket on the back of the front seat. In this pocket the officers found several slips of paper and two racing forms dated June 29th and June 30th, respectively. On the slips of paper were recorded bets written in a code usually used by bookies. The defendant told the officers that these articles were not his, that he had not put them in the car and that he did not know how they had got there. No attempt was made to prove that the recorded bets were in the handwriting of the defendant.

The defendant testified that he lived with his wife next door to the restaurant; that he had known the proprietor of the restaurant for about four years; that the proprietor was repairing the establishment and had asked him, as long as he was not working, to assist her with odd jobs about the place, which he did. The proprietor of the restaurant corroborated defendant. As to the $103 found on defendant, he testified that his wife had given him $50 from her paycheck to pay an overdue repair bill on his automobile. This was corroborated by defendant's wife. Forty dollars, defendant testified, he had borrowed from his mother for the same purpose. He had intended paying the repairman $100 on a past due bill of about $166. It was stipulated that the repairman, if called, would testify that the day before defendant was arrested defendant had telephoned to him and promised to pay $100 on the bill on the 30th. This stipulation was based upon the fact that a deputy district attorney had interviewed the repairman who corroborated defendant.

The trial judge was troubled over the admissibility of the evidence found in the automobile, and the validity of the search. He was particularly troubled over the fact that the defendant was arrested for vagrancy when he obviously was suspected of and searched for evidence of bookmaking. The court admitted the evidence subject to a motion to strike, and, thereafter, the matter was argued at some length. The court finally ruled that the evidence was admissible and found the defendant guilty of recording and registering bets, and of keeping a place (his car) for that purpose, but not guilty as to count 3—placing a bet.

The only evidence that defendant recorded bets or kept a "place" for that purpose is the evidence found in the search of the automobile. ▮ If that search was illegal, the evidence so secured was inadmissible. (*People* v. *Cahan*, 44 Cal. 2d 434 [282 P.2d 905].) Since the decision of the Cahan case, in April of 1955, the Supreme Court has decided more

than a score of cases in which it has reaffirmed the rule there stated, elaborated on it, explained it, and attempted, with obvious success, to fix its general scope and limits. (See Shepard's California Citations, August, 1956, p. 224.) Although not expressed in these words, after reading all of these cases, it is apparent that the central theme of all of them is that the Supreme Court is attempting to lay down rules that will be reasonably fair to the defendant and will also be reasonably fair and afford reasonable protection to the public. In the vast number of cases involving the point, the basic question is, would a reasonable officer, in possession of the facts known to him, have made the arrest and engaged in the search of the person or place involved? If so, the arrest and search were held to be proper, but if not, the search, at least, was held to be unreasonable, and the evidence secured in such search held to be inadmissible. The majority of the Supreme Court apparently believed that this was the only practical method to protect the constitutional guarantee of freedom from unreasonable searches and seizures. The court had observed the deliberate disregard of this constitutional guarantee by some law enforcement officers who openly advocated and practiced the policy that the end justifies the means. The new rule is sound, is predicated on the federal rule, and is based on fundamental principles of morality. Certainly, it cannot be the law that it is necessary for proper law enforcement that the law be broken in order to enforce it. For these reasons, we believe that the new rule is not only sound, but should be zealously protected by the courts against any unreasonable attempt to limit or to circumscribe it.

The present case is a good example of overzealous law enforcement. The arrest for vagrancy was an obvious subterfuge to try and secure evidence of bookmaking, and when that arrest, and the search of the person, failed to produce evidence of that activity, the police officers determined to search defendant's automobile. It is significant, so far as the record is concerned, that the officers did not even know defendant had an automobile until he so informed them during the improper search of his person. It is also significant that there is not one word of evidence to indicate that defendant had a past record of bookmaking, or of any other offense, that he had been reported to the police for engaging in bookmaking or other offense, had ever annoyed or molested anyone,

or even had ever acted in a suspicious manner. All that appears in the record is that the police, for some undisclosed reason, decided to keep a certain restaurant and pool hall under surveillance. Whatever that reason may have been, it certainly was not for the purpose of finding evidence that defendant was a vagrant. During that three-week period of surveillance, defendant was observed daily. During that time he was not observed committing one illegal or even suspicious act. He was observed reading the racing news in a daily newspaper, and occasionally talking with other visitors in the restaurant, apparently about the racing news. No money passed, no violations of law were observed, no pointing at names in the newspaper was observed, no telephone calls were made or received. There is no indication in the record that defendant was unkempt in appearance, annoyed or attempted to annoy anyone, or was without funds. In the one conversation the police had with defendant before his arrest he frankly stated that he was not presently regularly employed, but was doing odd jobs to support himself until he could secure regular employment. If those facts warrant the arrest of a person for vagrancy, then there is hardly a person walking the streets or visiting public places who cannot be lawfully arrested for vagrancy and searched against his will.

It is true that the vagrancy statute (Pen. Code, § 647, and particularly subdivision 1 thereof),* defines vagrancy in very broad terms. That subdivision of the section is apparently based on the outdated concept that it is a criminal offense not to work. Under it, every unemployed person, every housewife and every retired person conceivably could be arrested for vagrancy. If it be assumed that the section is constitutional, we certainly do not think it should be interpreted as broadly as respondent contends.

For these reasons we do not think that the arrest for vagrancy was a proper one. *Ipso facto,* the search of the person, predicated on such illegal arrest, was improper. It is equally apparent that the facts known to the officers did not constitute any grounds, far less reasonable grounds, for the officer to believe that defendant had violated any of the offenses prohibited in section 337a of the Penal Code. Nothing that defendant was observed doing was illegal, or even reason-

---

*Section 647, subdivision 1, of the Penal Code provides: ''Every person (except a California Indian) without visible means of living who has the physical ability to work, and who does not seek employment, nor labor when employment is offered him . . . Is a vagrant.''

ably suspicious. ▉ It is certainly not illegal or even reasonably suspicious to read, look at or discuss with others the sport page of a newspaper. If it is not a crime to do this for one day it does not become a crime, or a reasonably suspicious circumstance, standing alone, when it is done for 21 days.

▉ Thus, it is apparent that the arrest and search of the person of defendant were unreasonable and illegal. This makes it unnecessary to discuss the rules that might be applicable were the arrest for vagrancy a valid one.

▉ The only incriminating evidence that was introduced against defendant on the two charges upon which he was convicted was secured upon the search of the automobile. Respondent argues that defendant consented to this search. It is true that one of the arresting officers testified that defendant "furnished us the keys, and give us—gave us permission to search his car." This so-called "permission" was granted after defendant was improperly arrested and improperly searched. Without the purported consent, the search of the car would have been improper even if the arrest and search of the person had been proper. (*Hernandez* v. *Superior Court,* 143 Cal. App.2d 20 [299 P.2d 678].) While the question of consent is one of fact (*People* v. *Gorg,* 45 Cal.2d 776 [291 P.2d 469]), it is obvious that a "permission" granted after a person has been improperly arrested and searched, while he is still in custody, and without informing him of his legal right to refuse permission, is not a real or proper consent. The search of the car, under the circumstances, was clearly unreasonable.

The judgment appealed from is reversed.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied October 23, 1956, and respondent's petition for a hearing by the Supreme Court was denied October 31, 1956. Shenk, J., and Spence, J., were of the opinion that the petition should be granted.