[Crim. No. 14013. Second Dist., Div. Five. Jan. 17, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. LARRY JEF-
FERSON FULLER et al., Defendants and Appellants.

Richard H. Levin and Joseph O. Debus, under appointments by the Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Larry Ball, Deputy Attorney General, for Plaintiff and Respondent.

DRUCKER, J. pro tem.*—Defendants were charged by information with five counts of burglary. A public defender was appointed to represent both. Motion pursuant to section 995 of the Penal Code was denied and defendants pleaded "not guilty."

Motions for separate trials and to suppress evidence were argued and denied.

Defendants and both counsel waived jury trial, and the cause was submitted upon the transcript of the preliminary hearing and the testimony at the trial.

The defendants were found guilty as charged on all counts, and the court found the burglaries to be of the first degree as to counts I and II, and second degree as to counts III, IV and V. They were sentenced to state prison on each count, the sentences to run concurrently.

Both defendants filed a notice of appeal.

The evidence pertaining to the burglaries, as developed at the preliminary hearing, is briefly stated:

FRED L. JOYNER retired on the night of February 14, 1967, and when he arose at 6 o'clock the following morning, he discovered that a window screen had been broken, that his house had been entered, and that his pants, a wallet and a camera had been stolen.

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

ETHEL S. ROSEN left her home on March 13, 1967, and returned at midnight to find that a bedroom window screen had been ripped open, and that all her jewelry, an expensive jeweled wristwatch and two television sets were missing.

TED C. STEN left his residence on March 16, 1967, at 6 p.m., and when he returned at 10:45 p.m., he found that a bedroom window screen had been pulled loose and that a number of items were missing including two guns, two television sets, and a fireplace lighter.

MADELINE SILVERMAN left her residence about midmorning of March 17, 1967, and returned at 9:15 in the evening. She saw that the rear door to the house and the small door to the garage were open. She also discovered that the screen in the utility room had been cut or pulled open, that the glass in the kitchen door had been shattered, and that furs, clothing, money, jewelry and other items were missing.

MARSHALL B. HAYNER left his house about 5:30 p.m., on March 24, 1967, and returned about midnight to find that the back door had been pried open and that a mink stole, some heirlooms and wedding rings and other items were missing.

At the trial the testimony of Police Officer John J. Hurlbirt revealed that defendant Strieve (under the name of Donald Williams) had been arrested by the Los Angeles Police Department for a burglary committed in the Palisades area. In checking him out they found a rent receipt, indicating that he rented an apartment with another man at 1600 East Ocean Boulevard, Long Beach. The rent receipt was made out to Donald Williams and Larry Denico, aliases for defendants Strieve and Fuller.

These two men had been apprehended for a burglary in the Long Beach area several months before, but were released because the victim agreed not to prosecute if her property was returned to her. Officer Hurlbirt knew this, and knew that defendants were friends. Furthermore, he had been informed by the Los Angeles officers that two other men were involved with Strieve in the Palisades burglary, one of whom had driven the thieves to the scene in a 1956 pink and white Buick.

Because of this information, Officer Hurlbirt believed that Fuller may have been an accomplice in the Palisades burglary. Accompanied by Sergeants Lance and Donnell of the Los Angeles Police Department, he went to 1600 East Ocean Boulevard. A 1956 pink and white Buick was parked across the street.

Officer Hurlbirt had a picture of Fuller (alias Denico), which he showed to the manager, who said, ''Yes. That is Denico.''

The manager told the officers that Fuller's apartment (No. 5) was empty, but that they might find him visiting in another apartment (No. 3) occupied by Mr. and Mrs. Chariot and their small son. Officers Hurlbirt and Lance went to apartment number 3 and knocked. Mrs. Chariot opened the door. The officers identified themselves by badges and I.D. cards, said they were looking for Mr. Fuller, and asked to come in. She assented and stepped back, and the officers entered.

Officer Hurlbirt did not have a search warrant, so he asked if they might search the apartment, and Mrs. Chariot said, ''Yes.'' Shortly thereafter Sergeant Lance found Fuller in the bathroom, arrested him as a burglary suspect, and immediately informed him of his constitutional rights. Fuller stated that he understood his rights.

During a search of the apartment the officers found two or three large jewelry boxes containing various types of jewelry, ''maybe twenty to thirty necklaces and earrings, and so forth, . . .'' They also found a butane fireplace lighter, like the one described in the ''Sten'' burglary report.

Mrs. Chariot said that the items were not hers and that they came from Fuller's apartment.

On April 5, 1967, Officer Anthony Maletich of the Long Beach police had a conversation with Fuller at the Los Angeles County main jail, at which time he advised Fuller of his constitutional rights, enumerating them in detail. Fuller said that the Los Angeles police had already told him of his rights, and that he did not have to say anything else without an attorney.

Officer Maletich had a copy of the Rosen burglary report, and he showed it to Fuller who said that he remembered the beautiful watch he had taken out of the home because there were so many different stones in the bracelet that he thought it was phony.

The following day Officer Maletich talked with both defendants at the same time and place. He began by advising them of their constitutional rights. When asked if he understood these rights, Strieve said, ''Yeah, I've been told this twice by the L.A. police, that anything I do tell you would be strictly hearsay.''

The officer had the reports of the five Long Beach bur-

glaries, which he showed to the defendants. Strieve told him that in the Silverman burglary he had cut the screen with a screwdriver and then with the handle of the screwdriver broke the window out of the door and thereby entered. When Fuller was asked if this is what happened, he nodded his head affirmatively.

When shown a copy of the Sten burglary report, Strieve stated that Fuller, after tearing away a screen, used a jimmy on the locking device of the window, raised it and crawled in, and then let Strieve in. Fuller corroborated by saying he was the one who jimmied the window and crawled through.

Similar confessions were made with regard to the Rosen and Hayner burglaries.

As to the Joyner burglary, Strieve said that they had acquired a key and entered through the door.

With regard to their *modus operandi,* they stated that "they would hit between three and four burglaries a night. They would always try to work the better residences of the city . . . and that they always work between 6 and 9 p.m., and that they had various fences . . . that when they would burglarize a home they would take the articles and put them in a sheet or pillow case and place them somewhere near the house and then drive by and pick it up later. They always dressed in street clothes . . . later they would change their clothes when they returned to their vehicle which was normally a block away . . . they felt by doing this . . . it would lessen their chance of being apprehended."

When asked the approximate number of burglaries they had committed, the reply was: "Between 25 and 30 in the three months they had been working together."

They also told about the disposition they had made of some of the stolen articles.

Identification officers of the Long Beach Police Department testified that fingerprints found at the scene of the Rosen burglary were identified as those of Strieve.

Defendants are represented by separate counsel on appeal, but for the most part they raise the same issues, i.e., that the court erred (1) in admitting evidence obtained by illegal search and seizure; (2) in admitting the confessions of defendants in violation of their constitutional protection as set forth in the *Miranda* decision; and (3) in denying the motion that defendants be tried separately. They also argue that they should have been represented by separate counsel. Fuller also asserts there was no probable cause for his arrest.

Defendants challenge the legality of the search of Mrs. Chariot's apartment and maintain that the arrest of Fuller and the evidence and confessions that followed "were fruits of the poisonous tree," and therefore, inadmissible.

At the hearing on the motion to suppress evidence, the testimony indicated that the officer's request for permission to enter Mrs. Chariot's apartment, as well as permission to search the apartment, was freely granted. There was no assertion of authority, or demand for entry into the apartment. The trial court concluded that the consent was "clear as crystal" and denied the motion. Mrs. Chariot's constitutional rights were not violated when she freely consented to an entry and search. (*People* v. *Michael*, 45 Cal.2d 751, 753 [290 P.2d 852].)

Fuller urges that Mrs. Chariot should have first been advised of her right to refuse consent, as suggested in *People* v. *Wilson*, 145 Cal.App.2d 1, 7 [301 P.2d 974], but acknowledges that *People* v. *Roberts*, 246 Cal.App.2d 715 [55 Cal. Rptr. 62], has rejected this contention. In *Roberts*, at pages 728-729, the court said: ". . . . Failure to give such advice may, under the circumstances of a given case, be a factor to be taken into consideration in determining whether or not a *free* consent was actually given. (*People* v. *Wilson*, 145 Cal.App. 2d 1, 7 [301 P.2d 974].) Standing alone, however, it has been held not to be a decisive omission. (*People* v. *Burch*, 196 Cal. App.2d 754, 767 [17 Cal.Rptr. 102].)

". . . [T]he very request for permission to enter and search imports advice that a negative response is within the defendant's rights—when, as here, the implied finding is that the inquiries to the effect 'may we enter' and 'may we search' would be understood by the person questioned to be more than mere rhetorical. No pronouncement by the United States Supreme Court has made a warning of constitutional rights a prerequisite to a police officer's solicitation and obtaining of permission to enter and search." Mrs. Chariot was not under arrest, nor is there any indication in the record that she was even a suspect. The officers, looking for Fuller, were advised by the apartment manager that Fuller might be found in apartment number 3, occupied by Mr. and Mrs. Chariot. Under the circumstances of this case the failure to advise Mrs. Chariot of her right to refuse consent does not appear to be a decisive omission. (*People* v. *Roberts, supra*, 246 Cal.App.2d 715, 728-729.)

In *People* v. *Griffin*, 250 Cal.App.2d 545, 549-550 [58 Cal.

Rptr. 707], we said that the question whether the people can rely on consent in the absence of proof that a defendant was advised of his constitutional right not to consent, was left undecided by our Supreme Court in *People* v. *Henry,* 65 Cal. 2d 842, 846 [56 Cal.Rptr. 485, 423 P.2d 557].

It was held in *People* v. *Chaddock,* 249 Cal.App.2d 483, 485-486 [57 Cal.Rptr. 582], "There is no requirement in the law that an officer shall first advise a person of his constitutional rights and of his right to refuse to grant a consent to a search before the officer seeks a valid consent from the person to conduct a particular search. The mere asking of permission to enter and make a search carries with it the implication that the person can withhold permission for such an entry or search."

The prevailing opinion in this state of a number of Court of Appeal decisions is in accord with the viewpoint expressed in *Chaddock.* In *People* v. *Dahlke,* 257 Cal.App.2d 82, 87 [64 Cal.Rptr. 599], the court said: "There is likewise no merit to defendants' contention that Moorhead's consent was invalid because not preceded by a warning of his right to remain silent or his right to appointed counsel. In *People* v. *Smith* (1966) 63 Cal.2d 779 [48 Cal.Rptr. 382, 409 P.2d 222], one of the defendants, Mrs. Walker, consented to a search and also made certain incriminating statements at a time when she was under arrest and had not been advised of her right to counsel or her right to remain silent. Although the court held that it was error to admit the incriminating statements into evidence, the court upheld the validity of consent.

"Defendants' contention that Moorhead's consent must be deemed the result of an implied assertion of authority by the police is also untenable." (See also: *People* v. *De Leon,* 263 Cal.App.2d 155, 156 [69 Cal.Rptr. 653]; *People* v. *Sjosten,* 262 Cal.App.2d 539, 545-546 [68 Cal.Rptr. 832]; *People* v. *Link\** (Cal.App.) 68 Cal.Rptr. 71, 75, 77; *People* v. *Richardson,* 258 Cal.App.2d 23, 31 [65 Cal.Rptr. 487].)

Fuller contends that the police did not have reasonable cause to arrest him without a warrant. ▮ The prosecution has the burden of showing proper justification for an arrest without a warrant. *People* v. *Wright,* 236 Cal.App.2d 735, 737 [46 Cal.Rptr. 360].)

---

*A hearing was granted by the Supreme Court on June 19, 1968, and the cause was retransferred to the Court of Appeal, First District, Division One. The final opinion of that court is reported in 265 Cal. App.2d 297 [71 Cal.Rptr. 371].

In *People* v. *Ross,* 67 Cal.2d 64 [60 Cal.Rptr. 254, 429 P.2d 606], the court stated (pp. 69-70) : "A peace officer may arrest a person without a warrant whenever he has reasonable cause to believe that the person to be arrested has committed a felony. (Pen. Code, § 836, subd. 3.) 'Reasonable cause' is defined as that state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime. (*People* v. *Ingle,* 53 Cal.2d 407, 412 [2] [2 Cal.Rptr. 14, 348 P.2d 577] ; *People* v. *Fischer,* 49 Cal.2d 442, 446 [1] [317 P.2d 967].) No exact formula exists for determining reasonable cause, and each case must be decided on the facts and circumstances presented to the officers at the time they were required to act. (*People* v. *Ingle, supra,* at p. 412 [1] ; *People* v. *Ferguson,* 214 Cal.App.2d 772, 775 [4] [29 Cal.Rptr. 691].) "

In determining whether there was reasonable cause for arrest without warrant, police officers are justified in taking into account past conduct, character and reputation of the person suspected. (*People* v. *Baca,* 184 Cal.App.2d 693, 697-699 [7 Cal.Rptr. 864] ; *People* v. *Holmes,* 237 Cal.App.2d 795, 797 [47 Cal.Rptr. 246].)

In the light of the facts and circumstances the officers had probable cause to arrest Fuller.

Defendants contend that the requirements of *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], were not fully complied with. Fuller asserts that *"It nowhere appears that either Defendant was offered a lawyer or asked if he wanted one, or that either refused the services of a lawyer."* There is no validity to this assertion in view of the record that on more than one occasion they were advised of their right to have a lawyer and that if they could not afford a lawyer that one would be made available.

Strieve contends that he did not fully understand that what he said could be used against him, and that he thought that anything he said would be "hearsay," and could not be used against him. Both defendants were advised of their constitutional rights. After being so advised they were asked if they understood their rights and they answered affirmatively. Strieve commented that "Yeah, I've been told this twice by the L.A. police, that anything I do tell you would be strictly hearsay." The officer then advised him, in substance, "yes, it is hearsay, but it can still be used against you in court." When he was examined as a witness on this

point, Strieve admitted that he understood his rights given to him by the police but that he did not believe what the police said. ■■ A defendant who had been fully advised as to his constitutional rights under *Miranda* and understood these rights, cannot claim that he was not completely embraced within the arms of *Miranda* because he did not choose to believe the police.

■ The question of a knowing and intelligent waiver of the right to counsel is predominantly a question for the trial court, and its determination will not be disturbed on appeal unless it is "palpably erroneous." (*People* v. *Carter,* 258 Cal.App.2d 628, 634 [65 Cal.Rptr. 845] ; *People* v. *Salcido,* 246 Cal.App.2d 450, 454 [54 Cal.Rptr. 820] ; cf. *People* v. *Lara,* 67 Cal.2d 365, 392 [62 Cal.Rptr. 586, 432 P.2d 202].)

■ The determination by the trial court of this question adversely to the defendants is amply supported by the evidence.

■■ Whether a defendant who wrongly believes that the police have an erroneous conception of the hearsay rule can intelligently waive his *Miranda* rights is an interesting point, but not involved in this appeal. Strieve was fully examined by his own counsel, by the prosecutor and by the court concerning his understanding of what the police could do with any statement he was about to make. He contradicted himself in various particulars. While initially his position was that his statement would be hearsay because that is what the Los Angeles police had told him he finally admitted that even the Los Angeles police had informed him that anything he said could be used against him. While he then indicated that he did not believe the Los Angeles police either, the court was certainly entitled not to accept his word on that point.

Appellants claim that the trial court erred in denying their motion to be tried separately. ■■ When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court orders separate trials. (See Pen. Code, § 1098.)

■ Appellants cite the case of *People* v. *Aranda,* 63 Cal. 2d 518, 529-530 [47 Cal.Rptr. 353, 407 P.2d 265], which held that in a situation where "the confession of one defendant implicates codefendants," causing prejudice and unfairness, the defendants are entitled to separate trials. (Cf. *Bruton* v. *United States,* 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620].) Separate trials were not indicated by *Aranda* for a situation

such as the present case where, in a joint conversation, both defendants implicated themselves in the offenses charged.

In the case of *People* v. *Charles,* 66 Cal.2d 330 [57 Cal. Rptr. 745, 425 P.2d 545], both defendants confessed during questioning, and each gave a detailed account of what he and his codefendant did in the commission of all four of the robberies charged. The court said on page 337 that "failure to adhere to the *Aranda* procedure constitutes reversible error only if it causes prejudice." There is no prejudice here, even by application of the test of *Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].

As shown by the facts of the case at bench defendants each confessed and each was equally guilty. There is no evidence that prejudice or unfairness resulted from the joint trial. The trial court properly exercised its discretion in denying defendants' motion for severance.

 It is further contended that under the federal and California Constitutions, each appellant has the right to separate counsel, at least where there is actual or potential conflict of interest. No showing was made that there existed a conflict of interest between the defendants. A review of the record discloses no conflict of interest or potential conflict of interest between the defendants and no disadvantage to either of them from their joint representation by the public defender. If no adverse interest exists and none is claimed, the representation of both defendants by a single attorney is permissible. (*People* v. *Kerfoot,* 184 Cal.App.2d 622, 644-645 [7 Cal.Rptr. 674].) It is stated in *People* v. *Odom,* 236 Cal.App.2d 876, at page 878 [46 Cal.Rptr. 453]: ". . . Conflicts of interest among codefendants may arise when it would profit one defendant to attack the credibility of another (*People* v. *Kerfoot,* 184 Cal.App.2d 622 [7 Cal.Rptr. 674]); when counsel would be restricted in final summation because he might injure one defendant by arguments in favor of another (*People* v. *Donohoe,* 200 Cal.App.2d 17 [19 Cal.Rptr. 454]); when one defendant has a record of prior felony convictions and the others do not (*People* v. *Douglas,* 61 Cal.2d 430 [38 Cal.Rptr. 884, 392 P.2d 964]); when the defenses of codefendants are factually inconsistent (*People* v. *Welch,* 212 Cal.App.2d 397 [28 Cal.Rptr. 112]); or when appointed counsel believes a conflict of interest may exist (*People* v. *Douglas, supra* [61 Cal.2d 430 (38 Cal.Rptr. 884, 392 P.2d 964)]; *People* v. *Donohoe, supra*)."

 The defendants also contend, in essence, that al-

though no request for separate counsel was made, the court should have appointed separate counsel for each of the defendants as a matter of course. This contention is answered by *People* v. *Chacon,* 69 Cal.2d 765, 773-774 [73 Cal. Rptr. 10, 447 P.2d 106]. The Supreme Court stated: "The right to counsel at trial guaranteed by the Sixth Amendment of the United States Constitution (*Gideon* v. *Wainwright* (1963) 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792, 93 A.L.R.2d 733]) and article I, section 13 of the California Constitution does not include an automatic right to separate counsel for each codefendant. One counsel may represent more than one defendant so long as the representation is effective. (*Powell* v. *Alabama* (1932) 287 U.S. 45, 71 [77 L.Ed. 158, 171-172, 53 S.Ct. 55, 84 A.L.R. 527].)"

The final point urged by the defendants relates to the failure of the court to advise each of the defendants of his right to separate counsel, claiming that it is a constitutional and statutory duty to so advise multiple defendants. They rely mainly on *Lollar* v. *United States,* 376 F.2d 243, and its companion case of *Ford* v. *United States,* 379 F.2d 123.

In *Lollar,* the court quotes from its own opinion in *Campbell* v. *United States,* 352 F.2d 359 [122 App.D.C. 143], as follows: "'. . . [a]n individual defendant is rarely sophisticated enough to evaluate the potential conflicts [that can arise from joint representation], and when two defendants appear with a single attorney it cannot be determined, absent inquiry by the trial judge, whether the attorney has made such an appraisal or has advised his clients of the risks. Considerations of efficient judicial administration as well as important rights of defendants are served when the trial judge makes the *affirmative* determination that co-defendants have intelligently chosen to be represented by the same attorney and that their decision was not governed by poverty and lack of information on the availability of assigned counsel.'" (376 F.2d at 245.)

Recent cases suggest the advisability for the court, in assigning counsel for indigent defendants, to advise multiple defendants of their right to separate counsel if there is a conflict of interest or potential conflict of interest. The very nature of the accusation against multiple defendants may necessitate the assignment of separate counsel, or a careful exploration of any potential conflicts of interest. (See *People* v. *Chacon, supra*; and *People* v. *Odom, supra.*) In *Chacon* the Supreme Court stated: "If defendants were denied the right

to effective representation of counsel, we cannot presume that the right was waived by a failure to request separate counsel. The court did not advise them of their right to separate counsel if a conflict was present, and we cannot imply from their silence a waiver of that right.'' (69 Cal.2d at p. 774.)

But, as stated in *Lollar, supra,* at page 246: ''It is settled that some prejudice, some conflict of interest, resulting from the joint representation must exist before one can be said to have been denied effective assistance of counsel.''

In the instant case we find no conflict of interest and further find that the defendants were not prejudiced by joint representation. Neither defendant was denied his constitutional right to effective counsel. There is no error.

The judgments are affirmed.

Kaus, P. J., and Stephens, J., concurred.

The petition of appellant Fuller for a hearing by the Supreme Court was denied March 12, 1969.