## DELONE EMERSON BROWN *v.* STATE OF MARYLAND

[No. 358, September Term, 1969.]

*Decided September 16, 1970.*

216

The cause was argued before MURPHY, C.J., and ANDERSON, MORTON, ORTH, and THOMPSON, JJ.

*Jack R. Turney* and *William W. Grant* for appellant.

*Thomas N. Biddison, Jr., Assistant Attorney General,* with whom were *Francis B. Burch, Attorney. General, T.*

*Bryan McIntire, State's Attorney for Carroll County,* and *Fred A. Thayer, State's Attorney for Garrett County,* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

Delone Emerson Brown, the appellant, was convicted of second degree murder in the Circuit Court for Carroll County, in a court trial; a sentence of fifteen years was imposed. Brown had been convicted of the same crime in a previous trial, but the judgment was reversed by this Court in *Brown v. State,* 6 Md. App. 564, 252 A. 2d 272.

On this appeal, Brown contends: (1) the conviction should be reversed due to a conflict of interest in counsels' representation of appellant and a co-indictee, an alleged accessory after the fact; and that the trial court improperly: (2) refused to admit the confession of another to the murder, (3) admitted a statement made by the appellant, and (4) refused a motion for judgment of acquittal. For the reasons set out below, we reverse and remand.

On February 18, 1968, William Everett Paugh was stabbed to death in Bob and Madelyn's Tavern near Deer Park in Garrett County, Maryland. The stabbing occurred after a scuffle and argument between the appellant, the decedent, and Ruth Malcomb, the woman with whom the appellant was living, and who was indicted as an accessory after the fact. Although there were about 25 people in the tavern at the time, no witness admitted actually seeing the stabbing. The State called only two of those present to testify as to what occurred: Alexander Snyder and Ricky Malcomb, son of Ruth Malcomb.

Snyder testified he was a patron in the tavern on the evening in question. Noting that the tavern was dimly lit and noisy, Snyder said he saw the appellant and Ruth Malcomb sitting in a booth together. He also heard an argument between the deceased and Mrs. Malcomb at the booth. After the argument, a scuffle broke out during which the deceased swung at the appellant and the ap-

pellant held his hands in front of his face seeming to defend himself. The scuffle stopped and then started again about a half minute later, but Snyder was unable to see what happened because of the people surrounding the booth. After the scuffle stopped again, Snyder heard a thud and saw the deceased lying on the floor. Snyder did not see anyone with a knife; he did see Mrs. Malcomb hit the deceased; and he did not see the appellant leave his seated position next to the wall in the booth. Several times Snyder repeated he was not paying much attention and could not see the booth at the time of the homicide.

Ricky Malcomb, who was ten years old at the time of the crime, testified he lived with his mother, two sisters, and the appellant at his mother's house at that time. On the evening of February 18, 1968, he went to the tavern with Albert Paugh, the brother of the decedent, and Mrs. Paugh. At the tavern he sat with Mr. and Mrs. Paugh, his mother, and the appellant. In the tavern, he saw the deceased, whom he had previously known because he had lived with Ricky's mother. Ricky testified a fight erupted between the deceased and the appellant after some name-calling and shouting; during the fight the booth in which they were sitting was knocked over. After the fight, Ricky was taken home by his mother and the appellant. In the house, while he was in the other room, Ricky overheard a conversation between his mother and the appellant during which the appellant said "You don't have to worry anymore, I killed the son of a bitch." Ricky also observed the appellant burn a knife sheath. He testified he had seen the knife which belonged with the sheath earlier that evening at the tavern. He identified a knife shown to him by the prosecution as belonging to the appellant and said that he had seen the appellant with it at the tavern. On cross-examination, it was brought out that Ricky had not testified concerning the conversation in the first trial.

Virginia Lee Malcomb, the daughter of Ruth Malcomb, who was seventeen at the time of trial, stated that on the evening in question after her mother and appellant

returned to the house where Virginia was, she heard the appellant say "I killed the son of a bitch, he won't bother you or no one else no more." She also heard the appellant ask to be driven to Ohio but Mrs. Malcomb refused. Virginia contradicted Ricky as to where they were in the house when they overheard the appellant's conversation. Prior to the first trial, she had not revealed the conversation to joint counsel for appellant and her mother.

Trooper Robert Lashley testified about being called to the tavern after the stabbing, discovering the deceased lying on the floor, arresting Malcomb and the appellant, and recovering the knife, later identified as belonging to appellant.

Dr. Benedict Skitarelic, the medical examiner, testified as to the results of his examination of the decedent, including the stab wound in the left chest which was the cause of death. There were also two cuts on the right arm and right side of the chest. Blood alcohol content was .22, indicating the deceased was drunk at the time of death. Upon being called as a defense witness, Dr. Skitarelic testified that someone in a seated position against the wall in the booth described in the tavern could not inflict a wound like the one that caused death.

The defense called nine patrons in the tavern at the time of the stabbing as witnesses. Most of them did not observe any significant facts; however, two of them, the proprietor and a waitress, observed a fight between Mrs. Malcomb and the deceased, immediately after which the deceased fell to the floor and died. Several witnesses did testify to seeing the appellant remain seated in the corner of the booth against the wall. Such other facts as are necessary will be presented with the various contentions.

## CONFLICT OF INTEREST

Appellant contends there is a conflict of interest since the same counsel represented him as represented Ruth Malcomb, who had been indicted as an accessory after the fact. After the crime, Malcomb confessed to the killing, describing in great detail how she took a knife from ap-

pellant, carried it with her into the tavern, and stabbed the decedent. She later recanted this confession. After the first trial, Malcomb was told by a probation and parole officer that she "had nothing to lose" and could freely discuss the case; whereupon, she directed all guilt to the appellant. In the interim between the first and second trials, appellant's counsel indicated that Mrs. Malcomb would not speak or cooperate with counsel, but she did cooperate with the State by discussing the case without counsel present with the State's Attorney on several occasions. Also, neither of the Malcomb children revealed the alleged admission of guilt made by the appellant in Malcomb's home prior to or at the first trial although both did testify about it at the instant trial. The evening before the trial, appellant's counsel discovered that Mrs. Malcomb was to be a prosecution witness; however, she ultimately did not testify. Several times during the course of the trial, the problem of a conflict of interest was presented to the trial court, although it was presented in the context of a conflict of interest if Mrs. Malcomb testified, which she did not. Counsel did indicate that he felt hampered in his cross-examination due to the special knowledge that had come to him as a result of being Malcomb's attorney and expressed uncertainty about how to remedy what he felt was a clear conflict of interest.[1]

Although there have been numerous conflict of interest issue cases, the issue has been by no means resolved. Most logically, it can be handled by answering a series of questions:

    I. Is an actual or imminent conflict of interest present?

    II. Given an actual or imminent conflict of interest in existence,

---

1. Most of the facts set out under the heading "Conflict of Interest" were not established by testimony but were alleged in written and oral motions made immediately before and during the trial. We think the allegations of these facts were sufficient to put the trial judges on inquiry as to the possibility of a conflict of interest. The record does not show this question was considered at the time the same counsel were originally appointed to represent the appellant and Mrs. Malcomb.

    a. What quantum of prejudice must exist before there is reversible error?

    b. Does that amount of prejudice exist in the present case?

III. What responsibility, if any, is on the trial court to raise the conflict of interest *sua sponte*?

## I

### Existence of an Actual Conflict of Interest

In Maryland, a conflict of interest begins with a consideration of the requirement that either an actual conflict of interest exists or that a conflict of interest be "imminently potential", *Pressley v. State,* 220 Md. 558, 155 A. 2d 494. Previous Maryland opinions give general guidance in how to determine whether this requirement has been fulfilled. Within the facts of an individual case, it is proper to consider the complexity of both the law and the facts since the more complex a case becomes, either legally or factually, the more opportunity exists for a conflict of interest. Conversely, if the law is simple and the evidence of guilt strong, the opportunity for conflict of interest may be lessened. *Pressley v. State, supra.* Of course, the contention may still be found to be an unsupported allegation, *Pressley v. State, supra,* or to have been waived at trial, *Plater v. Warden,* 211 Md. 629, 126 A. 2d 574.

In addition to these general considerations, certain specific guidance is provided by Maryland precedent. This Court reaffirms its holding that mere joint representation, without more, of two or more defendants by one attorney is not a conflict of interest. *Davenport v. State,* 7 Md. App. 89, 253 A. 2d 768, 772. It would be unusual to find a conflict of interest when, as in *Davenport, supra,* each of the co-defendants presents an alibi which maintains his own innocence and coincidentally the innocence of his co-defendant, albeit the stories are conflicting. The mere fact that the stories are different does usually not present a conflict of interest if the innocence of both parties is maintained by both stories.

It is mainly to out-of-state cases that we must turn in order to review factual situations which have been found to contain actual or imminent conflicts of interests. Generally, if not always, a conflict of interest is found to be actual or imminent when the accuracy of the determination of guilt or innocence is questioned as a result of the conflict. This may be true when: (1) one co-defendant cooperates with the prosecution and attempts to place the blame for the crime on the other or (2) the effectiveness of cross-examination is significantly diminished as a result of an actual or imminent conflict of interest.

The leading Supreme Court case on conflict of interest, *Glasser v. United States*, 315 U. S. 60, 62 S. Ct. 457, 86 L. Ed. 680, dealt mainly with the quantum of prejudice involved and hence made no attempt to extensively analyze or catalog those factual situations which would include an imminent conflict of interest. The Court found that the inability of counsel to effectively cross-examine was an actual conflict of interest. In *Glasser,* one attorney represented two clients at a joint trial and could not effectively cross-examine prosecution witnesses because questions which would exculpate one client would inculpate the other. The importance of effective cross-examination was also crucial in *Commonwealth v. Jones*, 215 Pa. Super. 41, 257 A. 2d 367 (Pa. Super. Ct. 1969), *California v. Fuller,* 74 Cal. Rptr. 488 (Cal. Ct. App. 1969), *Application of Buffalo Chief*, 297 F. Supp. 687 (U.S.D.C., S. D. 1969), and *Craig v. United States*, 217 F. 2d 355 (6th Cir. 1954). In *Jones, Buffalo Chief* and *Craig,* relief was granted since the effectiveness of cross-examination had been impaired. As the cases indicate, cross-examination is especially important where it would benefit one party to attack the credibility of another party.

A case factually close to the instant case is that of *People v. Bopp*, 279 Ill. 184, 116 N. E. 679 (1917), wherein the Supreme Court of Illinois found error in appointing the same counsel to represent the accused and an accessory or co-defendant where they had different alibis, the alibi of one tending to exculpate himself but incul-

pate the other. A similar result was reached in *Commonwealth v. Jones, supra, Commonwealth ex rel. Whitling v. Russell,* 406 Pa. 45, 176 A. 2d 641 (Pa. S. Ct. 1962) and *United States v. Gougis,* 374 F. 2d 758 (7th Cir. 1967). In *Jones* and *Whitling,* each co-defendant attempted to shift all blame to the other defendant, while in *Gougis* the government solicited the cooperation of the co-defendant to present a version of the case that would convict the appellant.

Of special relevance to our consideration in this case are those cases in which one attorney was simultaneously representing the defendant and a prosecution witness against the defendant, who was usually under indictment or awaiting sentence. See *State v. Ebinger,* 97 N. J. Super. 23, 234 A. 2d 233 (N. J. Super. Ct. 1967), *People v. Ware,* 39 Ill. 2d 66, 233 N.E.2d 421 (Ill. S. Ct. 1968), *United States ex rel. Williamson v. LaVallee,* 282 F. Supp. 968 (U.S.D.C., N. Y. 1968) and *United States ex rel. Platts v. Myers,* 253 F. Supp. 23 (U.S.D.C., Pa. 1966).

In these cases, relief was granted since it was a harmful conflict of interest for one attorney to represent both a defendant and the witness who testified against him. A similar result was reached in *People v. Jenkins,* 32 A.D.2d 632, 300 N.Y.S. 2d 403 (S. Ct. N. Y. 1969) wherein a defendant was without his knowledge represented by the same attorney who represented the informer against him.

In actuality, the factual situations which contain an actual or imminent conflict of interest cannot be put into compartments as neatly as has been done in this analysis. A factual situation wherein the effectiveness of cross-examination has been impaired will frequently, though not always, contain conflicting alibis which exculpate one party but inculpate another. Even after a factual analysis of numerous cases, it is difficult to state general rules. Impaired cross-examination, exculpatory alibis and joint representation of defendant and a prosecution witness are mere signposts indicating that further inquiry into potential conflicts of interest is required rather than conclusive indications that a conflict already exists. Even

given the presence of these signposts, a case by case review remains a practical necessity.

In the instant case, our considerations of the factual situation lead to the conclusion that an actual conflict of interest existed. From the very beginning of the trial, counsel frequently indicated his cross-examination of Mrs. Malcomb, should she be called as a witness, and both of her children, who were called as witnesses, was significantly impaired in effectiveness due to a conflict of interest. A review of the record shows that the cross-examination was in fact less effective than that which might be expected. Further, Mrs. Malcomb had volunteered to the prosecution a story which completely exculpated herself by shifting all blame to the appellant. In addition, she had apparently cooperated more with the prosecution than with her own counsel.

While it is true that Mrs. Malcomb never testified for the prosecution, appellant apparently did not take advantage of the opportunity to call her as his own witness to establish in court what her story was, and should she be found to be a hostile witness, to cross-examine her concerning her own self-interest and self-serving statements or about her confession to the homicide. The most effective testimony against the appellant was presented by the Malcomb children at a time that counsel still represented their mother. The prospect of an attorney cross-examining the children about any attempts to influence their memories or testimony at a time when their mother could still be convicted presents a real conflict.

## II Prejudice

Given the existence of an actual conflict of interest, we must next evaluate the quantum of prejudice resulting from that conflict of interest to determine whether harmful error has occurred. This evaluation requires the answering of two sub-questions: (A) What quantum of prejudice is required before a conflict of interest is found to be harmful error? (B) Does that quantum of prejudice exist in the instant case?

## (A) Quantum of Prejudice

In this area the Supreme Court has provided its most useful guidance. In *Glasser v. United States, supra,* after establishing the existence of a conflict of interest, the Court said, 315 U. S. at 70-77, 62 S. Ct. at 465, 467-468:

> " 'Assistance of Counsel' guaranteed by the Sixth Amendment contemplates that such assistance be untrammeled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests. If the right to the assistance of counsel means less than this, a valued constitutional safeguard is substantially impaired. * * * Irrespective of any conflict of interest the additional burden of representing another party may conceivably impair counsel's effectiveness.
>
> "To determine the precise degree of prejudice sustained by Glasser as a result of the court's appointment of Stewart as counsel for Kretske [Glasser's co-defendant] is at once difficult and unnecessary. The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial. * * * Our examination of the record leads to the conclusion that Stewart's representation of Glasser was not as effective as it might have been if the appointment had not been made [to also represent the co-defendant]. We hold that the court thereby denied Glasser his right to have the effective assistance of counsel, guaranteed by the Sixth Amendment. This error requires that the verdict be set aside and a new trial ordered as to Glasser."

The Court also considered the strength of the government's case in view of the allegation of conflict of interest, 315 U. S. at 67, 62 S. Ct. at 463-464:

> "Admittedly the case against Glasser is not

a strong one . . . . This is significant in relation to Glasser's contention that he was deprived of the assistance of counsel contrary to the Sixth Amendment. In all cases the constitutional safeguards are to be jealously preserved for the benefit of the accused, but especially is this true where the scales of justice may be delicately poised between guilt and innocence. Then error, which under some circumstances would not be ground for reversal, cannot be brushed aside as immaterial since there is a real chance that it might have provided the slight impetus which swung the scales toward guilt."

Although *Glasser* stated "the right to counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial", and stated further reversal was required since "[counsel's] representation was not as effective as it might have been", there still remains a split of opinion as to the amount of prejudice required. This split was summarized in *Lollar v. United States*, 376 F. 2d 243 (C.A.D.C. 1967) wherein Judge J. Skelly Wright said, 376 F. 2d at 246:

"What constitutes sufficient prejudice, however, is uncertain, some courts apparently requiring a very strong showing of actual prejudice,[7] others suggesting the possibility of prejudice is sufficient.[8]

"7. See, e.g., *Lott v. United States*, 5 Cir., 218 F. 2d 675 (1955); *United States v. Burkeen*, 6 Cir., 355 F. 2d 241, *cert. denied, sub. nom. Matlock v. United States*, 384 U. S. 957, 86 S. Ct. 1582, 16 L.Ed.2d 553 (1966); *Lugo v. United States*, 9 Cir., 350 F. 2d 858 (1965).

"8. See e.g., *Glasser v. United States*, 315 U. S. 60, 75-76, 62 S. Ct. 457 (1942); *United States v. Dardi, supra* Note 6; *Sawyer v. Brough*, 4 Cir., 358 F. 2d 70 (1966); *Craig v. United States, supra* Note 3; *Commonwealth ex rel. Whitling v. Russell*, 406 Pa. 45, 176 A. 2d 641 (1962). And see Waltz, Inadequacy of Trial Defense Representation as a Ground for Post-Conviction Relief in Criminal Cases, 59 Nw.U.L. Rev. 289, 334 (1963); Note, The Right to Effective Counsel in Criminal Cases, 9 Vand.L.Rev. 1920, 1926 (1965)."

Judge Wright also explains the logic behind the Supreme Court's admonition against "nice calculations as to the amount of prejudice" by saying at 376 F. 2d at 246:

> "The obvious reason against insisting on a precise delineation of the prejudice suffered is that such a task is made very difficult when one must rely on a cold, printed record for reconstruction of the manifold and complex dynamics of the trial process, including reasons for trial tactics which may have been dictated by the joint representation."

In Maryland, *Pressley v. State, supra,* indicates that to merit relief there must be prejudice which prevents the lawyer from impartially and adequately representing his client. As to degrees of partiality and inadequacy, the opinion is silent. In this situation, the analysis returns to *Glasser, supra,* and the resultant split of opinion.

This Court feels the better position, in line with both *Pressley* and *Glasser,* is that there must be a showing of some prejudice but the prejudice need only be slight before relief is required. While *Pressley* requires a showing of prejudice, *Glasser* is written in terms too specific to require more than slight prejudice. Hence, the Supreme Court granted a new trial since the representation of *Glasser* "was not as effective as it might have been. . . ." Thus, this Court holds that once an actual or imminently potential conflict of interest is shown, the only demonstration of prejudice that is required is that counsel was not as effective as he might have been had the conflict not existed.

### (B) Prejudice in the Instant Case

Having decided that a conflict exists in the present case and having decided that once a conflict is shown, some prejudice, although only slight prejudice, must also be shown, it remains to evaluate whether sufficient prejudice exists in the facts of this case to require relief. We hold there is sufficient prejudice to require a reversal.

As the Supreme Court did in *Glasser, supra,* we note that the case against appellant here was not strong, being significantly weaker than the case in either *Pressley* or *Davenport, supra.* This weakness shows in all phases of the trial from the opening statement, through the testimony of all the witnesses, and in the findings of the court at the close of the trial.

In his opening statement the State's Attorney was well aware of the dearth of probative evidence, the poor conditions for observations in the tavern, and the crucial nature of the Malcombs' testimony. The State's Attorney's prediction of a weak case was borne out in the evidence introduced at trial, where no witness, either from the State or the defense, actually saw the stabbing. At the conclusion of the trial, the trial judge was also aware of the weak nature of the evidence against the appellant, and relied heavily on the testimony of the Malcombs about appellant's statement that he stabbed the victim.

It is clear the defense counsel, due to the conflict of interest, was significantly impaired in his cross-examination of the Malcombs, who presented the most damaging testimony. This impairment prejudiced the appellant at least to the slight degree prejudice is required. Any question or legitimate tactic the defense counsel could have adopted to lessen the credibility of the Malcombs would have directly benefited the appellant. There were numerous questions which were available to undermine their credibility which were not asked by counsel.

It is not the purpose of this opinion to catalog the subtle and psychological means to influence the testimony of a witness, especially a child, but given the situation that a ten year old, whose mother was also indicted, was the key witness, this point should have been explored, indeed exhausted, to guarantee appellant a proper trial. Nor was it explored at trial whether Ricky Malcomb was aware of the proceedings against his mother and whether that awareness affected him. At the time of appellant's trial, Mrs. Malcomb was cooperating with the State's Attorney's office, without her attorney's knowledge, in a man-

ner which was never explored. In the absence of such an exploration in a case where the factual issue is as close as it is here, with as much circumstantial evidence, where the essential testimony is given by the children of the co-indictee, the prejudice is so clear that the case must be reversed.

Further, it is entirely possible that counsels' strategy would have been entirely different if they had not represented Mrs. Malcomb. It is possible that defense counsel would have called Mrs. Malcomb as a hostile witness, and either forced her to tell her story in open court where she could be cross-examined, or require her to take the Fifth Amendment.

The complexity of the relationship between Mrs. Malcomb, appellant Brown, the State's Attorney, the Malcomb children, and defense counsel, none of which was adequately explored, leaves too much uncertainty that appellant's counsel were effective in spite of the conflict of interest to allow this conviction to stand.

In addition, there is the defense attorneys' own opinions of the conflict of interest in this case. Though caught somewhat by surprise at Mrs. Malcomb's cooperation and willingness to testify for the prosecution, the defense attorneys consistently maintained there was a conflict of interest, though its definite bounds and specific application were not explored at trial. While the attorneys' own opinions of whether there is a conflict of interest is not binding, we do take note of those opinions especially when they are substantiated by conduct at trial that can only be explained by an inhibited attitude on the part of counsel. In this record, it frequently appears that when an effective advocate would have moved forward forcefully, defense counsel held back in the cross-examination of the Malcomb children. The prejudice which exists in this factual situation is heightened by the attorneys' own realization that they were impaired in their presentation of the case.

Having determined there is error and prejudice resulting from the conflict of interest, it is clearly not harmless

beyond a reasonable doubt, *Chapman v. California,* 386 U. S. 18, 87 S. Ct. 824, 17 L.Ed.2d 705 and a reversal is required.

### III  Duty of the Trial Court

Even if neither the defense attorneys nor the State's Attorney presents the conflict of interest issue to the trial court, the court still has a great responsibility.

> "Upon the trial judge rests the duty of seeing that the trial is conducted with solicitude for the essential rights of the accused . . . 'with a caution increasing in degree as the offenses dealt with increase in gravity.' *Patton v. United States,* 281 U. S. 276, 312, 313, 50 S. Ct. 253, 263, 74 L. Ed. 854, 70 A.L.R. 263. * * * Of equal importance with the duty of the court to see that an accused has the assistance of counsel is its duty to refrain from embarrassing counsel in the defense of an accused by insisting, or indeed, even suggesting that counsel undertake to concurrently represent interests which might diverge from those of his first client, when the possibility of that divergence is brought home to the court." *Glasser, supra,* 315 U. S. at 71, 76, 62 S. Ct. at 465, 467.

Thus, where, as here, the conflict was so immediately obvious and apparent the trial court has the responsibility, with or without objection from counsel, to protect the right of the accused from being lessened by an actual or imminent conflict of interest.

### MRS. MALCOMB'S CONFESSION

At appellant's trial, certain questions arose concerning admissibility of evidence which will likely arise again on retrial. Among these points is the admissibility of a confession made the day after the homicide by Mrs. Malcomb to Trooper Lashley that she killed the deceased, describing with some particularity how she obtained the knife from the appellant, hid it in her purse, concealed it under

the tavern table, and used it to stab the deceased. Appellant tried to introduce the confession in order to direct guilt away from himself.

As the Court of Appeals said in *Dyson v. State,* 238 Md. 398, 209 A. 2d 609 at 614:

> "Although Maryland formerly followed the general rule that a penal declaration against interest of a third party was not admissible evidence, the later cases have established that a confession by one other than the defendant, that he committed the crime in question, should be received and considered by the trier of the guilt of the accused, unless it is clearly collusive, frivolous or otherwise obviously untrustworthy."

The Court of Appeals has discussed three ways in which the confession of someone other than the accused could be introduced in evidence. In *Thomas v. State,* 186 Md. 446, 452, 47 A. 2d 43, 46, the Court outlined these three methods:

(1) If the confessor is called as a witness at the trial of defendant, the defendant should be allowed to introduce the confession in evidence and question the confessor in regard to the confession and the circumstances under which it was made.

(2) If a police officer has secured contradictory confessions from two different persons, the defense should be permitted to question him about both confessions.

(3) The confession itself is apparently admissible without calling either the confessor or the police officer to whom it was given, unless it appears that there was some collusion in obtaining it.

Thus, should the trial court be faced again with attempts by appellant to introduce the confession of Mrs. Malcomb, it should decide the admissibility based on this discussion.

### ADMISSION OF STATEMENT

Appellant contends his statement, purportedly made at the Malcomb house after the crime, that he killed the de-

ceased, should not have been admitted in evidence in the testimony of Ricky and Virginia Malcomb. He alleges violation of the principle of *Massiah v. United States,* 377 U. S. 201, 84 S. Ct. 1199, 12 L.Ed.2d 246, in that the State illegally discovered this evidence while interviewing Mrs. Malcomb, in the absence of her counsel, at the time she was under indictment and represented by counsel. While that case might be relevant to the trial of Mrs. Malcomb, we fail to see its applicability to the trial of the appellant. Assuming the State violated Mrs. Malcomb's rights, that does not constitute a violation of the appellant's rights, despite the fact that both persons were represented by the same counsel. Constitutional rights are ordinarily personal and the violation of another's rights cannot be raised by an accused unless the violation at the same time also violates the personal rights of the accused. In addition to the language of *Massiah, supra,* see *Alderman v. United States,* 394 U. S. 165, 89 S. Ct. 961, 968, 22 L.Ed.2d 176; *Griswold v. Connecticut,* 381 U. S. 479, 85 S. Ct. 1678, 14 L.Ed.2d 510; *Barrows v. Jackson,* 346 U. S. 249, 73 S. Ct. 1031, 97 L. Ed. 1586; *McChan v. State,* 238 Md. 149, 158, 207 A. 2d 632; *Brown v. State,* 177 Md. 321, 9 A. 2d 209 and *Stewart v. State,* 1 Md. App. 309, 314, 229 A. 2d 727.

## MOTION FOR JUDGMENT OF ACQUITTAL

Since the evidence offered at a new trial may be different from that of the instant trial, we will not discuss the sufficiency of the evidence question beyond saying the contention is without merit in view of the evidence adduced at this trial.

*Judgment reversed and case remanded for a new trial.*